IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JACORY BROWN,<br><br>                    Petitioner,<br><br>vs.<br><br>C. PFEIFFER, Warden, Kern Valley State<br>Prison,<br><br>                    Respondent. | No. 2:16-cv-2747-JKS<br><br>MEMORANDUM DECISION |

Jacory Brown, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254.  Brown is in the custody of the California Department of Corrections and Rehabilitation and incarcerated at Kern Valley State Prison. Respondent has answered, and Brown has replied.

## I.  BACKGROUND/PRIOR PROCEEDINGS

Brown was charged with attempted premeditated murder and other offenses after he fired from the back seat of a friend's car multiple rounds into the side of another vehicle, seriously injuring two of the vehicle's passengers, Nehemiah and Garvin Johashen.[1]  On direct appeal of his conviction, the California Court of Appeal recounted the following facts underlying the charges against Brown and the evidence presented at trial:

> We begin with undisputed facts.  On November 13, 2011, at about 8:30 p.m., Nehemiah and Garvin walked to a fast food restaurant on Elkhorn Boulevard in North Highlands.  At the restaurant, Nehemiah called a friend, Trayvion Pointer, and asked for a ride.  Pointer, who was on a date with Marquell Witten at the time, drove to the restaurant with Witten in the front passenger seat and picked up Nehemiah and Garvin, who got into the back seat.  Pointer was driving a Volvo.

---

[1]     Because the victims have the same last name, this Court will, like the California Court of Appeal, refer to them by their first names for clarity.

Meanwhile, [Brown] was in the back seat of a Chevy Malibu in the restaurant's drive-through. The Malibu belonged to Alexander Ford, who was seated in the front passenger seat. The driver's identity was disputed. [Brown] had previously been "jumped" by friends of Nehemiah and Garvin over the outcome of a dice game. Because of this, "hard" looks were exchanged between occupants of the two vehicles. The Volvo then exited the restaurant parking lot, drove eastbound on Elkhorn Boulevard, and entered Interstate Highway 80 (I–80) heading westbound. The Malibu followed, caught up to the Volvo as it entered the freeway, and pulled up along the driver's side of the car, at which point the Malibu's backseat passenger lowered the window and opened fire with a large caliber handgun. Bullets struck both Nehemiah and Garvin, causing great bodily injury.

The dispute at trial was over who occupied the back seat of the Malibu at the time of the shooting. Ford testified for the prosecution and implicated [Brown]. [Brown] testified in his own defense and implicated Ford. We provide a detailed summary of their respective testimony. We then set forth the evidence corroborating Ford's account, including victim identification of [Brown] as the shooter prior to trial, although these identifications were recanted at trial.

### *Ford's Testimony*

Ford testified he met [Brown] through a mutual friend, Elijah Nevarez, about a week before the shooting. Ford, Nevarez, Nick Buzo, and another man drove from Stockton to Sacramento to "find a party, drink." Nevarez drove Ford's car. They ended up at an apartment belonging to one of Nevarez's friends, a man named Paul. [Brown] was also at Paul's apartment. At some point, Ford and Paul got into an altercation. Ford explained: "[Paul] got drunk and angry and he got mad at me for being in a side bedroom for a second. And [Brown] came and pulled him away from me and told him not to treat his guest like that . . . ." Ford was unsure whether he and his friends stayed the night at Paul's apartment or rented a motel room, but they returned to Stockton the following day.

About a week later, on the day of the shooting, Ford, Nevarez, and Buzo again drove from Stockton to Sacramento. Nevarez again drove Ford's car. After picking up another man, who went by the name "Gwop," at Paul's apartment, they drove to a motel to get a room and party. At some point in the afternoon, after drinking alcohol and smoking marijuana in the room, they also picked up [Brown]. Later in the evening, Ford and Nevarez decided to drive to a fast food restaurant to get some food. As they were getting into Ford's Malibu, Nevarez behind the wheel and Ford in the front passenger seat, defendant decided to join them and got into the back seat. Nevarez drove to the restaurant and pulled into the drive-through. When they got to the front of the line, Pointer's Volvo pulled in front of the Malibu and stopped, blocking their exit from the drive-through. The Volvo then pulled around so it was parallel to the Malibu. [Brown] said: "Those are the guys that want to kill me. Don't look at them because the one always carries a .40 with a 30–round clip on him." [Brown] also said: "Don't worry, I have protection."

The Volvo then pulled out of the parking lot, traveled eastbound on Elkhorn Boulevard, and got onto I–80. The Malibu followed and caught up to the Volvo on the

on-ramp. According to Ford, no one told Nevarez to "[c]atch the car," but as the Malibu approached the Volvo, [Brown] said: "I should get them before they get me." Ford protested: "I don't want to do that in my car because I don't want to get in trouble for this." [Brown] and Nevarez both assured him they would not "snitch." As the Malibu pulled up beside the Volvo, Ford heard "loud bangs" coming from behind him in the car and "ducked down." Ford then looked in his rear view mirror, saw the Volvo slide off of the freeway, and said: "Man, I think you killed them." [Brown] responded: "No snitching." Nevarez drove back to the motel. Inside the room, [Brown] told Gwop: "'You remember the niggas that said they were going to kill me?'" "'Well, they know I'm not some little bitch that they're just going to punk.'"

### *[Brown's] Testimony*

[Brown] confirmed he met Ford at Paul's apartment and intervened in an altercation between Ford and Paul. According to [Brown], Ford was bragging to Paul about Stockton being more "active" than Sacramento, which [Brown] understood to be a boast of toughness, and "Paul basically wanted to test him and see if he was all talk." After [Brown] intervened, Ford thanked him for "having his back." Ford then rented a motel room, where [Brown] drank alcohol and smoked marijuana with Ford and his companions before they returned to Stockton. [Brown] also testified he had several interactions with Ford over the span of a few weeks between their initial meeting at Paul's apartment and the night of the shooting. According to [Brown], he helped Ford sell four pounds of marijuana during this time.

The day of the shooting, Ford picked [Brown] up at Paul's apartment. [Brown] confirmed Ford's account of who was with him, except for the addition of a man who went by the name "Least–O."[FN2] [Brown] also confirmed Ford rented a motel room, where the group drank alcohol and smoked marijuana. Later that night, according to [Brown], he decided to leave the party and caught Ford and Least–O as they got into Ford's car to pick up some food. [Brown] asked Ford, who was "extremely drunk" and seated in the front passenger seat, for a ride to Elkhorn Boulevard and Andrea Boulevard, which happened to be where the fast food restaurant was located. Ford agreed. [Brown] got into the back seat. Least–O drove to the restaurant and pulled into the drive-through. At this point, Ford noticed someone in the restaurant "looking at the car real, real hard." [Brown] looked up, saw Nehemiah and Garvin in the restaurant, and said: "Yeah, they—those are the individuals that mess with the people—that hang out with the people that jumped me."[FN3]

> FN2.   Ford testified that Least–O was Nevarez's nickname. [Brown] testified that Least–O was a separate person.

> FN3.   [Brown] explained he had no problems with either Nehemiah or Garvin, but three unidentified friends of theirs had previously "jumped" him over the outcome of a dice game; however, according to [Brown], he "end[ed] up beating them up—all three of them" and "got to keep all [his] stuff."

Ford became "agitated" and "aggressive" and said: "Are those the people that jumped you?  The people that jumped you?"  Ford then "started muggin' 'em real, real hard."  [Brown] believed Ford felt he owed [Brown] because [Brown] "had his back with Paul" and tried to diffuse the situation by telling Ford: "'Nehemiah carries a gun'" and "'you need to calm down.'"  The "aggressive" looks continued when Nehemiah and Garvin got into Pointer's Volvo, which pulled in front of Ford's Malibu at the front of the drive-through line.  [Brown] again told Ford to "'calm down.'"  Ford responded: "'I ain't no little bitch.'"  When the Volvo drove away, [Brown] asked to be dropped off behind a convenience store in the same parking lot.  Ford and Least–O complied.  As [Brown] got out of the car, Ford said: "I'm going to show you how we get down in Stockton."  He then retrieved "something" from his trunk and got into the back seat.  The Malibu departed.  [Brown] then sent a text message to a friend named "Bear," who picked him up.  He spent the next two or three hours with Bear.  At some point, an unidentified person called [Brown] and told him Nehemiah had been shot.  Gwop then called and told [Brown] to come back to the motel room, which he did.  In the motel room, Ford was "drunk and bragging" that he "laid 'em down."

### *Corroboration of Ford's Testimony*

After the shooting, the Volvo slid off of the freeway and came to a stop as Pointer passed out for a brief moment and released his foot from the accelerator.  When he regained consciousness, Pointer drove to a nearby motel.  Law enforcement and medical personnel arrived a short time later.  Nehemiah and Garvin were transported to the hospital, where they each provided a brief statement.

Nehemiah stated he clearly saw [Brown's] face as the Malibu's back window rolled down, just before a gun emerged and started shooting.  He provided a name: "Jacory or Cory."  He also provided an accurate description: "A [B]lack male, early twenties, dark-skinned, wearing a do-rag.  He's approximately six foot tall and had an athletic build."  With respect to the Malibu's driver and front seat passenger, Nehemiah said "they might have been two white guys or one possibly Hispanic."  Ford is White; Nevarez is Hispanic.  Nehemiah also explained he believed the shooting involved a "dice game," where someone owed [Brown] $300, and one of Nehemiah's friends "got beat up over this money."  Garvin also stated the shooter was "a [B]lack male" with "short hair" and "wearing a do-rag," although he believed the shots came from the front passenger seat.

About a month later, both Nehemiah and Garvin picked [Brown] out of a photographic lineup.  After Nehemiah chose [Brown's] photo, which was in the number five position, he wrote in the comments section: "I'm almost one hundred percent number five is the person who shot me and my little brother."  After Garvin chose [Brown's]  photo, he wrote in the comments section: "Number five looks like him."[FN4]

> FN4.   At trial, Nehemiah and Garvin recanted these identifications.  They also acknowledged being a "snitch" is not looked upon favorably "out there on the streets."

[Brown] and Ford were each arrested. After Ford was released on bail, [Brown] sent him a letter, through another inmate. Because a certain statement in this letter is the evidence the Attorney General argues [Brown] failed to explain in his testimony, we set forth the contents of the letter in the discussion below. For present purposes, it will suffice to note Ford understood the letter to be a warning against "snitchin[g]" on [Brown], a reasonable interpretation. Accordingly, the letter was admitted into evidence to show [Brown's] consciousness of guilt.

*People v. Brown*, No. C074297, 2015 WL 1887110, at *1-4 (Cal. Ct. App. Apr. 27, 2015).

At the conclusion of trial, the jury convicted him of two counts of attempted premeditated murder, two counts of assault with a firearm, one count of shooting at an occupied vehicle, and one count of possession of a firearm by a convicted felon. Various firearm and great bodily injury enhancement allegations were also found true. The trial court sentenced Brown to an aggregate indeterminate prison term of 89 years to life imprisonment plus a consecutive determinate term of 7 years.

Through counsel, Brown appealed his conviction, arguing that: 1) the prosecutor committed misconduct by vouching for a prosecution witness; and 2) the trial court erred in instructing the jury with CALCRIM No. 361 regarding how the jury should evaluate Brown's testimony. The Court of Appeal unanimously affirmed the judgment against Brown in a reasoned, unpublished opinion issued on April 27, 2015. *Brown*, 2015 WL 1887110, at *7. The California Supreme Court summarily denied Brown's petition for review on July 8, 2015.

Brown then filed in the California Superior Court a *pro se* habeas petition dated April 21, 2016, which raised six claims of ineffective assistance of trial counsel and a claim of prosecutorial misconduct. The superior court denied the petition in a reasoned, unpublished decision issued on June 29, 2016.

Brown then raised the same seven claims in a habeas petition filed on August 1, 2016, in the California Court of Appeal. The appellate court denied the petition without comment on August 12, 2016. Brown additionally raised those claims by way of habeas petition filed in the California Supreme Court, which was likewise summarily denied on November 9, 2016.

Brown timely filed a Petition for a Writ of Habeas Corpus in this Court on November 17, 2016. Docket No. 1 ("Petition"); *see* 28 U.S.C. § 2244(d)(1),(2).

## II. GROUNDS/CLAIMS

In his *pro se* Petition before this Court, Brown raises the seven claims he unsuccessfully raised to the California state courts on habeas review. Namely, Brown argues in Grounds 1 through 6 that trial counsel rendered ineffective assistance by failing to: 1) object to certain identification evidence; 2) adequately investigate his claim; 3) object to the admission of highly prejudicial uncharged conduct evidence; 4) introduce evidence of a prior, consistent statement; 5) move to strike portions of Detective Biggers' testimony; and 6) use extrinsic evidence to challenge Detective Biggers' testimony regarding Nehemiah's statements implicating Brown. Brown additionally contends in Ground 7 that the prosecutor committed misconduct by making improper comments during summation.

III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C.

§ 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding,"

§ 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that

contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that

are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives

at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1)

"refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the

relevant state-court decision."  *Id.* at 412.  The holding must also be intended to be binding upon

the states; that is, the decision must be based upon constitutional grounds, not on the supervisory

power of the Supreme Court over federal courts.  *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where

holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it

cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"

*Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are

beyond the purview of this Court in a federal habeas proceeding.  *See Swarthout v. Cooke*, 131 S.

Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was

correctly applied).  It is a fundamental precept of dual federalism that the states possess primary

authority for defining and enforcing the criminal law.  *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court.  *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)).  A summary denial is an adjudication on the merits and entitled to deference.  *Harrington v. Richter*, 562 U.S. 86, 99 (2011).  Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

A.     *Ineffective Assistance of Trial Counsel* (Grounds 1-6)

Brown argues that trial counsel rendered ineffective assistance for a variety of reasons. To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced his defense.  466 U.S. 668, 687 (1984).  A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."  *Id.*

The Supreme Court has explained that, if there is a reasonable probability that the outcome might have been different as a result of a legal error, the defendant has established

8

prejudice and is entitled to relief.  *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95.  Where a habeas petition governed by AEDPA alleges ineffective assistance of counsel, the *Strickland* prejudice standard is applied and federal courts do not engage in a separate analysis applying the *Brecht* harmlessness standard.  *Avila v. Galaza*, 297 F.3d 911, 918, n.7 (9th Cir. 2002); *see also Musalin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009).  Under this rubric, in reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold."  And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v. Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

Thus, Brown must show that his trial counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different.  *See Hill v. Lockhart,* 474 U.S. 52, 57 (1985).  An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs.  *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

1.   *Failure to object to identification evidence*

Brown first claims that trial counsel was ineffective in failing to object to identification evidence.  According to Brown, a defense investigator interviewed victim Nehemiah Johashen

on November 16, 2012, and Nehemiah told the investigator that the police had brought a picture

of Brown to his house and informed Nehemiah that the picture was of the person who had shot

him.  Brown alleges that Nehemiah told the investigator that Brown did not shoot him.  Brown

argues that, since counsel had this information prior to the preliminary hearing on December 7,

2012, counsel should have used that information to challenge Nehemiah's lineup identification,

which he contends would have led to its suppression.  Brown further contends that, if the lineup

identification had been suppressed, his codefendant Ford's testimony would not have been

corroborated and thus would likely also have been suppressed.

On habeas review, the superior considered this claim and denied it for failure to set forth

a prima facie case for relief as follows:

> The crimes occurred on November 13, 2011, around 8:30 p.m.  One of the
> documents attached [to Brown's state habeas petition] is a copy of a police report dated
> November 13, 2011, showing that at a time partially cut off from the copy provided but
> probably just after the shooting, it was reported that a deputy spoke with Nehemiah at the
> hospital trauma room and Nehemiah said, "I can't really talk to the cops right now.  My
> jaw is wired shut and I'm having a hard time breathing.  I don't know who shot me.  I
> don't know who did this.  Maybe later on after I get out of here I can figure it out.  I can
> not talk anymore."
>
> Another document attached is a copy of a police report dated November 13, 2011,
> reporting that probably shortly thereafter, at 10:20 p.m., Nehemiah told an officer that
> "the dude I met once was in the backseat of the car and he's the one who shot at us.  I
> saw the rear window roll down just before he shot and that gave me the opportunity to
> clearly see his face.  He lit up (shot up) our whole backseat. . . .  I'm sure this is the same
> nigga Jonas was talking about I just don't know his name.  I think they call this dude
> 'Jacory' or 'Cory.'  The shooter—he's a black male, shave hair, he was wearing a doo-
> rag, he's about 22-23 years old, dark skinned, maybe 6' tall, with an athletic build.  The
> gun he used was big.  It had to be at least a .40 caliber.  I heard this du[de] is from
> [blanked out] but he's always in North Highlands . . . .  There were at least two other
> dudes in the car.  They were both in the front seat.  Both may have been white but one
> could have been Hispanic.  I only know the dude who shot at us and he's black.  Oh look,
> I guess this dude shot at some of my brothers a couple of months back.  One of my
> friends I guess owed him like three hundred dollars or something.  So the dude tried to
> snake him or beat him up and some of my brothers tried to help my friend.  So I guess
> because some of my people got involved he targeted me tonight.  You feel me.  None of

these guys were in any gang.  They were just friends or associates.  So, he tried to shoot onas and now he tried to kill me and my little brother (Garvin).  The money owed may have come from a dice game.  That's what my friend got beat up over.  That's all I know. I'm not going to give any other names but I think Jonas can identify this dude by name.  I can identify this guy if I saw him again."

The third document is a copy of a report of an investigator to the Public Defender, stating that on November 6, 2012, the investigator interviewed Nehemiah, who stated "I never made any statement to the police about who shot me.  The police said that Jacory got caught up with a gun.  They brought a picture of Jacory to my house.  The police said, 'This is who shot you, does he look[] familiar?'  I said, 'How do you know who shot me?'  The police officer said, 'The streets are talking.'  They said that he was shooting at people before, and that my friend had given him up.  The police just showed up with the picture and they asked me which one was Jacory and I pointed to one and said, 'This one.'  They told me to circle and initial it.  I never said that he was the on who shot at me, though. . . .  As far as what happens to Jacory, I don't care.  If the charges are dropped, it doesn't matter to me.  But he did not shoot me, not that I'm aware of.  'I'm not afraid of him, of course not.'  We are not friends, but I know him because he is one of my friends' friend."

The court's underlying file contains a copy of the reporter's transcript from the December 7, 2012 preliminary hearing, at which Officer Biggers testified that on December 21, 2011, which was about one month after the shootings, Biggers met with Nehemiah and Garvin at the station house, to show them a photo lineup that included a photograph of petitioner, whom Biggers identified in court, and that both Nehemiah and Garvin, in separate rooms, picked out petitioner's photograph.  Biggers himself, alone, had showed both victims the lineup.  When Nehemiah was shown the lineup, Nehemiah picked out petitioner's photograph as the person who shot Nehemiah and Garvin, and Nehemiah placed his initials next to the photograph of petitioner.  On cross-examination, Biggers was asked if before the lineup he had gone out to the victims' residence, and Biggers replied that he had not; there was no further inquiry on that subject.

Had defense counsel moved to exclude the lineup either before or at the preliminary hearing and presented evidence that Nehemiah, a year after the shootings and Nehemiah's identification of petitioner in the lineup, had told a defense investigator that the officer had come to Nehemiah's home and been suggestive in getting the identification of petitioner, it would not have been likely to have resulted in exclusion of the lineup.  Too much time had passed, and Nehemiah by then had had second thoughts about having identified petitioner as the shooter; indeed, by the time of trial, Nehemiah had recanted his identification of petitioner as the shooter out of fear of retaliation on him in the streets.  It was not reasonably probable that the trial court would have simply excluded the identification; rather, the trial court would have allowed the identification to be introduced at trial and allowed petitioner to present evidence that the identification had been tainted.

Nor has petitioner shown that even if it is true that an officer had come to Nehemiah's house and shown Nehemiah the photo, that that had occurred before Biggers showed Nehemiah the phone lineup.

11

Nor was there any ineffective assistance at trial with regard to this matter.  As petitioner admits, "During trial, Nehemiah elaborated on the person who brought the picture to his house.  Nehemiah explained it was his brother's probation officer . . . [w]ho showed him the petitioner's picture and told him 'this is the person who shot you.'  As such, it appears that the jury <u>was</u> informed about Nehemiah's claim that was made to the investigator, and that the jury had opportunity to give that testimony whatever weight the jury felt was appropriate.  Simply put, this remained a credibility contest before the jury, between petitioner's testimony, denying guilt, and the testimony of his codefendant Ford, that petitioner was the shooter, plus Nehemiah's and Garvin's by-the-time-of-trial-retracted identifications of petitioner as the shooter, with the addition of Nehemiah's testimony that he had been shown a photo of petitioner and been told that petitioner was the shooter.

Nor does petitioner now present any affidavit from Nehemiah's brother's probation officer[] attesting to having gone to Nehemiah's house before Nehemiah's December 21, 2011 photo lineup identification of petitioner, having shown Nehemiah petitioner's photo, and having told Nehemiah "this is the person who shot you."

Lodged Document ("LD") No. 8 at 5-7 (citations omitted).

The Superior Court ultimately rejected Brown's claim after concluding that there was insufficient evidence in the record to demonstrate that the photo lineup identification was unduly suggestive.  *Id.* at 7.  Such a determination constitutes a decision on the merits.  *See Phelps v. Alameida*, 569 F.3d 1120, 1126 n.8 (9th Cir. 2009) (rejection of claim for failure to state prima facie case constitutes denial on the merits of the claim).

Evidence derived from a suggestive pretrial identification procedure may be inadmissible if the challenged procedure was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."  *See Simmons v. United States*, 390 U.S. 377, 384 (1968).  To determine the admissibility of identification testimony, courts use a two step analysis. *United States v. Love*, 746 F.2d 477, 478 (9th Cir. 1984).  First, they determine whether the identification procedure was impermissibly suggestive.  *Id.*  Each case must be considered on its own facts, and whether due process was violated depends on the totality of the surrounding circumstances.  *Simmons*, 390 U.S. at 383-84.  If the court finds that a challenged procedure is

12

not impermissibly suggestive, the due process inquiry ends. *United States v. Bagley*, 772 F.2d

482, 493 (9th Cir. 1985). However, if a court finds that the procedure was impermissibly

suggestive, it then determines whether the identification was nevertheless reliable under the

totality of the circumstances. *Neil v. Biggers*, 409 U.S. 188, 198-99 (1972); *Love*, 746 F.2d at

478.

      The factors to be considered in evaluating the reliability of an identification after an

impermissibly suggestive identification procedure include:

> [1] the opportunity of the witness to view the criminal at the time of the crime, [2] the
> witness' degree of attention, [3] the accuracy of the witness' prior description of the
> criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and
> [5] the length of time between the crime and the confrontation.

*Biggers*, 409 U.S. at 199-200. These five indicia of reliability must be balanced by the

reviewing court against the corrupting effect of the suggestive pretrial identification procedure to

determine whether the in-court identification should have been admitted. *Manson v.

Braithwaite*, 432 U.S. 98, 114 (1977). In a motion to suppress, the defense bears the burden to

show the unconstitutionality of the identification procedure. *See People v. DeSantis*, 831 P.2d

1210 (Cal. 1992).

      Again, to prevail on a claim of ineffective assistance of counsel predicated on counsel's

failure to file a motion to suppress evidence, a petitioner must establish both that the motion

would have been meritorious and a reasonable probability that the jury would have reached a

different verdict absent the introduction of the evidence. *Kimmelman v. Morrison*, 477 U.S. 365,

375 (1986); *Ortiz-Sandoval v. Clarke*, 323 F.3d 1165, 1170 (9th Cir. 2003). Brown does not do

so here because, for the reasons persuasively articulated by the California Superior Court, he

fails to demonstrate that the lineup identification procedure was impermissibly suggestive or

13

unreliable given the totality of the circumstances.  Brown provides the same evidence in support of his claim before this Court, which is likewise insufficient to establish that counsel was deficient or that he was prejudiced by counsel's inaction.  *See Woodford v. Visciotti*, 537 U.S. 19, 15 (2002) (*per curiam*) (holding that state habeas petitioner carries the burden of proof).  The California Superior Court's rejection of Brown's claim is both reasonable and fully supported by the record.  Brown is thus not entitled to relief on this claim.

2.      *Failure to investigate*

Brown next argues that trial counsel was ineffective for failing to personally interview Nehemiah about his statement to the defense investigator.  According to Brown, such inquiry would have enabled counsel to pursue defenses that Nehemiah identified Brown solely on what he had heard from a person named Marcell; that Nehemiah had two brain surgeries that might have affected his ability to make a reliable identification; and that Nehemiah only picked Brown's photo from a lineup because Garvin's probation officer had previously shown him Brown's photo.  But again, Brown fails to provide any evidentiary support for this speculative claim.  Just as his claim was denied on state habeas review, the lack of evidentiary support is also fatal to his claim on federal habeas review.

3.      *Object to admission of prior uncharged acts evidence*

Brown additionally faults counsel for failing to object to testimony by Detective Bigger that Nehemiah told him on the night of the shooting that the person who shot him and Garvin was the same person who had shot his friend, Jonas Calhoun.  Brown contends that the admission of this testimony allowed the jury to improperly consider evidence of uncharged conduct, despite the trial court's questioning on the admissibility of evidence regarding Calhoun.

14

But as the Superior Court concluded, Detective Bigger's statement was not offered for the truth of the matter asserted; *i.e.*, it was not admitted to prove that Brown shot Calhoun. Rather, it was introduced to explain Nehemiah's belief that the same person who had shot at Calhoun had shot at Nehemiah and Garvin.  Accordingly, the Superior Court correctly concluded that the statement was not inadmissible hearsay.  *See* FED. R. EVID. 801(c)(2) (defining hearsay as a statement that "a party offers in evidence to prove the truth of the matter asserted in the statement").  Moreover, the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."  *Crawford v. Washington*, 51 U.S. 36, 59 n.9 (2006).  Brown is therefore not entitled to relief on this claim.

4.     *Failure to introduce a prior consistent statement*

Brown next contends that trial counsel should have introduced Nehemiah's first statement at the hospital that he did not know who shot him as a prior consistent statement that would have supported Nehemiah's recantation of his identification of Brown.  The Superior Court denied the claim, reasoning:

> [A]ny error in this regard is not shown to be prejudicial.  The first statement was probably made when Nehemiah first came to the hospital, at a time when he could have been in such pain that he was unable to organize his thoughts, whereas the second statement at the hospital was probably given sometime later when he was better able to gather his thoughts.  In any event, he did later identify petitioner in a photo lineup, as did Garvin, and that coupled with codefendant Ford's testimony was overwhelming evidence of petitioner's guilt.  Petitioner does not show that introducing this statement, if it was not introduced, would have been reasonably likely to have made a difference in the outcome of the trial.

The Superior Court's determination is both reasonable and fully supported by the record. In any event, the record reflects that trial counsel asked Nehemiah about his initial statement during cross-examination of Nehemiah.  The record thus belies Brown's contention that counsel

15

did not introduce evidence of Nehemiah's initial statement.  Accordingly, he is not entitled to relief on this ground in any event.

5. *Failure to move to strike portions of Detective Biggers' testimony*

Brown additionally argues that trial counsel was ineffective for failing to move to strike portions of Detective Biggers' testimony for failure to satisfy the personal knowledge requirement of Evidence Code § 702.[2]  According to Brown, because Nehemiah testified that he did not know the name of the shooter, Biggers should not have been allowed to testify that Nehemiah had told Biggers that the shooter was named "Jacory" or "Cory."

But as the Superior Court determined:

> Biggers was probably allowed to testify to Nehemiah's statement to Biggers in the hospital[] as a prior inconsistent statement to Nehemiah's testimony at trial.  That Nehemiah testified at trial that Nehemiah did not know who the shooter was does not render Nehemiah's statement to Biggers actual personal knowledge of the identity of the shooter.  Rather, Nehemiah's statement to Biggers was a clear identification of what Nehemiah had seen of the shooter, and that Nehemiah recanted at trial does not render Nehemiah's statement to Biggers inadmissible for lack of personal knowledge.  Rather, both were admissible and it was a credibility determination for the jury to make as to which version should be believed.

Again, that determination is both reasonable and fully supported by the record.  Brown is not entitled to relief on this ground.

6. *Failure to object to Detective Biggers' testimony based on Nehemiah's medical history*

Brown relatedly argues that trial counsel should have challenged Detective Biggers' testimony regarding Nehemiah's statements implicating Brown by introducing evidence about

---

[2]     That provision provides that "the testimony of a witness concerning a particular matter is inadmissible unless he has personal knowledge of the matter.  Against the objection of a party, such personal knowledge must be shown before the witness may testify concerning the matter."  CAL. CODE EVID. § 702(a).

Nehemiah's brain surgeries.  According to Brown, trial counsel should have "sp[oke] to Nehemiah in an effort to obtain cooperation for Nehemiah's testimony about his medical history proving he did indeed have brain surgery and then obtain[] an expert witness if need be to testify how it could affect his memory."  Brown avers that, armed with that medical information, counsel could have successfully objected to Biggers' testimony on the grounds that it had no probative value.

But again, Biggers' testimony was admitted as evidence of a prior inconsistent statement. Any evidence challenging the veracity of the previous statement would not change the fact that the statement was probative; it merely highlights that the veracity of Nehemiah's statements was a credibility determination squarely before the jury.  Moreover, as discussed in Ground 2, Brown has not provided documentary evidence supporting his speculative contention that Nehemiah's brain surgeries affected his memory and led him to falsely identify Brown as his shooter.  In any event, Brown fails to show that such evidence would have led the jury to believe his version of events rather than Ford's.  Brown is therefore not entitled to relief on this claim in any event.

B.    _Prosecutorial Misconduct_ (Ground 7)

Brown additionally contends that the prosecutor committed misconduct by making improper remarks to the jury during summation.  Federal habeas review of prosecutorial misconduct claims is limited to the narrow issue of whether the alleged misconduct violated due process.  *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  To prevail on such a claim, a petitioner must show that the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  Moreover, "[o]n habeas review, constitutional errors of the 'trial type,'

17

including prosecutorial misconduct, warrant relief only if they 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012) (quoting *Brecht*, 507 U.S. at 637-38 (1993)).

Under clearly established federal law, a prosecutor's incorrect and improper comments will be held to violate the Constitution only if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Parker v. Matthews*, 132 S. Ct. 2148, 2153 (2012) (per curiam) (quoting *Darden v. Wainright*, 477 U.S. 168, 181 (1986)); *see Sassounian v. Roe*, 230 F.3d 1097, 1106 (9th Cir. 2000). In determining whether the prosecutor's remarks rendered a trial fundamentally unfair, the remarks must be analyzed in the context of the entire proceeding. *Boyde*, 494 U.S. at 385; *Darden*, 477 U.S. at 179-182. Even when prosecutorial misconduct rises to the level of a due process violation, such misconduct provides grounds for habeas relief only if that misconduct is prejudicial under the harmless error test articulated in *Brecht v. Abrahamson*, 507 U.S. 619, 637-638 (1993). *Shaw v. Terhune*, 380 F.3d 473, 478 (9th Cir. 2004).

Brown fails to satisfy these standards with respect to any of his contentions. Brown first avers that the prosecutor committed misconduct by arguing in summation that the victims did not care and were living by their own set of rules, and by urging the jurors not to let the code of the street take the place of the rules of law and society. The record reflects that the prosecutor stated in closing argument that "it would be fairly easy to say, Hey, look, these folks in that care who got shot up don't care. The Johashens don't care. Right? They didn't want to be here. They didn't want to participate. And they don't care what you do. The question is: Do we operate under the rule of law as a civilized society or, as jurors, are we willing to let the code of the

street take its place?"  The Superior Court concluded that this "argument was merely proper commentary on the victims' recantation of their identifications of petitioner as being part of the rules of the street, to which the victims also testified, and that the prosecutor was merely arguing that the jurors need to follow the law and not the rule of the street. . . .  [I]n this case, the prosecutor . . . merely urged the jurors to follow the law, which is not improper. . . ."  This determination is both reasonable and fully supported by the record.

Brown also argues that the "prosecutor committed misconduct by arguing in closing that petitioner engaged in potential witness tampering and deception which was false and not supported by evidence in the record[] when the prosecutor stated in closing that the jurors should keep in mind that Nehemiah was in custody, and that the prosecutor had asked petitioner if petitioner had bumped into Nehemiah there and talked with Nehemiah, and petitioner would not answer."

The record reflects that, during cross-examination of Brown, the prosecutor asked him about a letter he wrote to Ford while in jail that stated that things were looking positive in his case and discouraged Ford from cooperating with law enforcement.  Specifically, the prosecutor asked Brown what he meant in the jail letter by "it's looking positive."  Brown testified, "Well, there's no evidence in the case.  There's no—there's nothing.  Basically, it's just he say/she say. . . .  And he's in the good and I'm in the jail."  The prosecutor then argued in summation:

> And I asked him about this on the stand, and he tried to talk about it.  But in the end, he can't and he didn't.  But he said, 'The case is looking positive.'  Now, keep in mind that Nehemiah Johashen was in custody.  It's when he had the bullet removed.
> Now, how in the world could the case be looking positive?  What about it?  I asked him, Mr. Brown, Well what did you mean by that?  Well, there's no evidence.  Come on now.  You know better than that.  You got people who have said, at least in the past, that you shot 'em.  They've picked you out of photographic lineups.  You know Mr. Ford has already made a statement to Detective Biggers, giving at least your name.

What is it that's looking positive?  Did you bump into Mr. Johashen?  Did you have a little talk with him?  Who knows.  He wouldn't tell us.  I asked.  He had an opportunity to explain what he meant by that, and he didn't.

The Court's independent review of the record supports the Superior Court's conclusion that the prosecutor's comments represented a fair comment on the evidence as presented, including Brown's testimony.  Although Brown disagrees with the prosecutor's assessment of that testimony, he was given an opportunity to present a conflicting reason, which the jury apparently found not credible.  Accordingly, Brown fails to show that the prosecutor's comment was improper, much less that it rose to the egregious level required for habeas relief.

Brown next argues that the prosecutor misstated the evidence when he told the jury that Nehemiah has a tattoo that reads "no snitchin.'"  According to Brown, the prosecutor fabricated the tattoo to bolster his argument that Nehemiah had a motive to recant his identification of Brown.  But the record reflects that the prosecutor referred to the tattoo when discussing the photographs of Nehemiah's exposed body by crime scene investigators.  As the Superior Court noted, it thus appears that the jurors had evidence of the tattoo from photographs of Nehemiah's body.  Brown fails to provide this Court with any documentary evidence that contradicts the Superior Court's reasonable conclusion; he merely relies on the absence of any reference to the tattoo in the testimony of the witness.  Again, this lack of evidentiary support is fatal to his claim. *See Turner v. Calderon*, 281 F.3d 851, 881 (9th Cir. 2002) ("self-serving statement" insufficient to raise claim for relief).

Finally, Brown claims that the prosecutor falsely told the jury that Nehemiah referred to the shooter as "Cory" or "Jacory" in his first statement to law enforcement when he actually provided those names in his second statement.  As discussed *supra*, however, the record reflects

20

that the jury heard that Nehemiah's initial statement, while in the hospital, that he did not know

who shot him.  So even assuming that the prosecutor misspoke as to when the reference to

"Cory" or "Jacory" was made, Brown fails to show either that the misstatement was egregious,

or that, absent the misstatement, he would have achieved a better result.  In sum, Brown fails to

show that he is entitled to relief on any argument advanced in support of his prosecutorial

misconduct claim.

## V. CONCLUSION AND ORDER

Brown is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ

of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of

Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain

a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree

with the district court's resolution of his constitutional claims or that jurists could conclude the

issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*,

537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: September 14, 2020.

   /s/James K. Singleton, Jr.   
JAMES K. SINGLETON, JR.
Senior United States District Judge
